IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RALPH F. RENTZELL    :
          :  CIVIL ACTION
   v.       :
          :  NO. 10-4270
DOLLAR TREE STORES, INC.  :

SURRICK, J.              MARCH 5, 2012

**MEMORANDUM**

Presently before the Court is Defendant Dollar Tree Stores, Inc.'s Motion for Summary Judgment.  (ECF No. 15.)  For the following reasons, the Motion will be granted.

I.  **BACKGROUND**[1]

Plaintiff Ralph F. Rentzell is a former employee of Defendant Dollar Tree Stores, Inc.  In 2002, he was hired by Defendant to serve as a Store Manager in Defendant's Bethlehem, Pennsylvania and Allentown, Pennsylvania locations.  (Pl.'s Aff. ¶ 4, ECF No. 16.)

Prior to Plaintiff's hire, the management style at these two stores was "less than professional [which had] resulted in non-profitable operations."  (*Id.* at ¶ 8.)  When Plaintiff arrived as Store Manager, he "introduced professional management principles."  (*Id.* at ¶ 9.)  Some of Plaintiff's subordinate employees "grumbled because [he] was making them work."  (*Id.*)  While Plaintiff was Store Manager, monthly sales increased at Defendant's Bethlehem location.  (*Id.* at ¶ 6(b).)  Monthly sales were higher than sales from previous years.  (*Id.* at ¶ 6(c).)  Plaintiff and his Assistant Managers received monthly bonuses as a result of the store's

---

[1] We view the facts and the reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff, the nonmoving party.  *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

increase in productivity.  (*Id.* at ¶¶ 6(b)-(c).)  In light of the increased productivity of the

Bethlehem store, Plaintiff was transferred to Defendant's Allentown location with the goal of

increasing sales there.  (*Id.* at ¶ 6(e).)  While Plaintiff was Store Manager at the Allentown

location, monthly sales increased, and he and his Assistant Managers received monthly bonuses

as a result.  (*Id.*)  Plaintiff received the maximum monthly bonuses when working in the

Allentown store.  (*Id.* at ¶ 6(f).)

    In May 2007, Marianne Holohan became Plaintiff's District Manager.  (*Id.* at ¶ 23.)  As

Plaintiff's supervisor, she became aware of several complaints against him.  On June 5, 2007,

Defendant received a customer complaint about Plaintiff.  (First Assoc. Form, June 8, 2007,

Def.'s Mot. Ex. D, ECF No. 15-5.)  The customer claimed that she received poor customer

service when she requested to purchase an item.  Plaintiff received a written warning and was

notified that continued "poor customer service could lead to disciplinary action" and result in

termination.  (*Id.*; Holohan Dep. 66-68, Pl.'s Opp. Ex. C, ECF No. 20.)  On July 14, 2007,

Plaintiff received a complaint for violating Defendant's smoking policy, as well as another

customer complaint.  (Second Assoc. Form, Aug. 13, 2007, Def.'s Mot. Ex. D; Holohan Dep. 61-

62.)  The July 14, 2007 Associate Form, signed by Holohan on August 13, 2007, noted that

Defendant had received "numerous customer complaints" with regard to his "customer service

level."  (Second Assoc. Form.)  It also stated that further violation of the smoking or customer

service policies would result in termination.  (*Id.*)  On August 13, 2007, Holohan issued a written

warning to Plaintiff because he went home early on August 8, 2007 because of an illness, was not

at work on August 11, 2007, and failed to notify Holohan that he was out sick.  Holohan stated

that further violation would result in termination.  (Fourth Assoc. Form, Aug. 13, 2007, Def.'s

Mot. Ex. D; Holohan Dep. 65-66.)  On August 26, 2007, there was another customer complaint filed against Plaintiff for "unsatisfactory customer service, [and] miss representation[sic] of Dollar Tree dealing with customers, outside vendors, banks[,] etc." (Fifth Assoc. Form, Aug. 28, 2007; Holohan Dep. 69-74.)[2]  This resulted in Plaintiff's termination.  (Fifth Assoc. Form; Pl.'s Aff. ¶¶ 14, 23.)

After Defendant terminated Plaintiff, several employees sent Holohan a card thanking her for firing Plaintiff.  (Pl.'s Aff. ¶ 12; Card, Def.'s Mot. Ex. E, ECF No. 15-5.)  Some of the employees who signed the card were subsequently fired by, or left, Defendant.  They were "difficult employees who were not serious about their work."  (Pl.'s Aff. ¶ 13; *see also* Holohan Dep. 45-49 (testifying that various individuals who signed the card left the company or were terminated).)

After being terminated, Plaintiff diligently and conscientiously applied for many jobs, without success.  (Pl.'s Aff. ¶ 14; *see also* Job Search List, Pl.'s Opp. Ex. B, ECF No. 19-3.)  He sent his resume to over 1,000 potential employers.  (Pl.'s Aff. ¶ 15.)  Based on his work experience, Plaintiff believed he was qualified, and should have received offers, for many jobs. (*Id.* at ¶ 16.)  While Plaintiff received responses from employers, and initial and call-back interviews, he was not receiving offers for employment despite having what he believed to be

---

[2] In addition, an employee working for Plaintiff stated that she "found him to be repeatedly rude and offensive to customers in the store in a manner and tone that was completely against the customer service training and level of service required by [Defendant]."  (Cintron Aff. ¶ 5, Def.'s Mot. Ex. F, ECF No. 15-5.)  He would "intentionally scream at customers in an inappropriate tone and manner often leaving customers feeling obviously embarrassed."  (*Id.* at ¶ 7.)  She also averred that Plaintiff "routinely discriminated against certain groups of paying customers; namely African Americans and Hispanics."  (*Id.* at ¶ 6.)  Another individual who worked under Plaintiff's supervision while working for Defendant made similar averments.  (*See* Plaza Aff. ¶¶ 3-5, Def.'s Mot. Ex. G, ECF No. 15-5.)

positive interviews.  (*Id.* at ¶ 17.)  Plaintiff became suspicious that he was being "sabotaged" by

someone from Defendant.  (*Id.* at ¶ 18.)  He hired a private investigator from Totally Confidential

Investigations, Inc. ("TCI") to investigate his suspicion.  (*Id.*)  The private investigator contacted

"specific people" working for Defendant and reached Holohan.  (*Id.* at ¶ 19.)

In March 2010, the private investigator called Holohan at 12:51 p.m.  On that same day,

Holohan returned his call at 1:32 p.m.  (TCI Report 1, 3, Pl.'s Opp. Ex. A, ECF No. 19-2.)

Holohan did not know the name of the person to whom she was speaking over the phone.

(Holohan Dep. 32, 74-75.)  The private investigator told her than he "was investigating a

background."  (*Id.* at 32, 34, 40-41.)  She began the conversation with the private investigator by

notifying him that Defendant had "specific rules on what we are suppose[d] to say," then

proceeded to answer the investigator's questions.  (TCI Report 3.)  Holohan said that since she

had only known Plaintiff from May 2007 to August 2007,[3] she had limited information about

Plaintiff and should not be commenting on his job performance.  (Pl.'s Aff. ¶ 23.)[4]

Nevertheless, when asked whether she could provide a reference with respect to Plaintiff,

Holohan said that she preferred not to and "kind of chuckled."  (Holohan Dep. 32.)

Holohan stated that Plaintiff's strengths included "annoying people."  (TCI Report 1.)  Holohan

stated that Plaintiff had no problem solving skills and no technical skills, that Plaintiff had

conflicts with employees and customers, and that Plaintiff was terminated because he could not

---

[3] Holohan testified that she may have come into contact with Plaintiff at manager
meetings or may have seen him at a store meeting, but she "wouldn't have known who he was."
(Holohan Dep. 16-17.)

[4] In addition, Defendant had a company policy that supervisors should not comment to
third parties about a former employees' job performance.  (Pl.'s Aff. ¶ 24(a).)  Holohan was
aware of Defendant's policy prohibiting the "badmouthing" of former employees.  (*Id.* at ¶ 21.)

deal with customers.  (Pl.'s Aff. ¶ 20; TCI Report 2.)  In addition, Holohan stated that Plaintiff was "a strange person and hard to deal with" and that she would not rehire him.  (Pl.'s Aff. ¶¶ 20-21; TCI Report 2-3; Holohan Dep. 35.)  Holohan understood that these comments were negative.  (Holohan Dep. 37, 40.)  When asked whether Plaintiff worked on multiple projects simultaneously, Holohan responded that she did not know since she did not work with him for long enough.  (TCI Report 2.)[5]

---

[5] At her deposition, Holohan testified that she does not recall telling the private investigator that Defendant had specific rules limiting what could be said about former employees.  (Holohan Dep. 79.)  She does not recall being asked to characterize Plaintiff's problem solving skills.  (*Id.*)  She does not recall being asked what Plaintiff's strengths were, or that she responded by saying "annoying people."  (*Id.* at 81.)  Moreover, Holohan does not recall being asked to assess Plaintiff's problem solving or technical skills, whether he worked on multiple projects simultaneously, or whether he had "constant conflicts with employees and customers."  She does not recall stating that she did not work with him long enough to know.  (*Id.* at 82-85.)  She remembers telling the private investigator only that Plaintiff was a store manager and that he was not rehireable.  She characterized this as a "standard" answer.  (*Id.* at 82.)  For purposes of this Motion, we view all facts in favor of Plaintiff, the nonmoving party, and assume that what was stated in the private investigator's report actually occurred.

Plaintiff asserts that "[o]n the record before this Court, there were at least two different occurrences when [Holohan] gave negative information to third parties on the telephone about [Plaintiff], one to a private investigator, and second when she did not say that Plaintiff had conflicts with employees, only that he was not rehireable."  (Pl.'s Opp. 10, ECF No. 19.)  We fail to see on the record that the alleged second incident occurred.  Holohan testified that other than the telephone conversation with the private investigator, she never discussed Plaintiff with anyone else and never received any request from employers for references concerning Plaintiff:

Q.  Okay.  Did you ever get an e-mail saying that somebody wanted to talk to you about a job reference for [Plaintiff]?
A.  No.
Q.  Never?
A.  Never.
Q.  Did you ever get a phone call?
A.  I've never gotten any personal phone calls, no.  I know someone had called several of my stores and they gave me a number of a gentleman to call back, and so finally after a couple weeks I called him back so he would leave my stores alone.  And that was in March of 2009.

Plaintiff is presently sixty years old.  (Pl.'s Aff. ¶ 1.)  Up until the point when he was terminated by Defendant, Plaintiff had been, for the most part, employed continuously in the retail sales industry since the age of eighteen.  (*Id.* at ¶¶ 2-3.)[6]

Plaintiff testified that he does not know whether any of the employers to which he submitted a job application contacted anyone at Defendant.  (Rentzell Dep. 100, Def.'s Mot. Ex. B, ECF No. 15-2.)  Plaintiff identified some thirty-seven different employers to which he has submitted job applications.  Defendant contacted these employers.  None had any record or recollection of having employment reference conversations with Defendant with regard to Plaintiff.  (*See* Subpoena Resp., Def.'s Mot. Ex. C, ECF No. 15-3.)

Plaintiff commenced this action on August 23, 2010, alleging causes of action for defamation, negligence and tortious interference with a contract.  (Compl., ECF No. 1.)  On September 29, 2011, we granted Defendant's motion to dismiss the negligence count.  (ECF Nos.

---

(Holohan Dep. 31-32; *see also id.* at 34 (testifying that other than this one telephone conversation with the private investigator, Holohan never discussed Plaintiff with anyone), 42-43 (testifying that she was "absolutely positive that [she] only had one phone call").)

There are two disputes that arise from Holohan's testimony, when compared with other evidence in the record.  First, Holohan testified that she had the telephone conversation with the private investigator in March 2009, whereas the private investigator's report shows that the conversation occurred in March 2010.  Second, Holohan does not recall the questions asked by the investigator, or the answers she provided in response, with respect to that conversation with the private investigator.  These disputes, however, do not reasonably support an inference that there were two different occurrences during which Holohan disseminated negative information about Plaintiff to third parties.  (*See* Holohan Dep. 36 (testifying, "No, it was March, but I don't know the year.  I apologize.  I get confused from year to year, so much goes on between daily stuff . . . . ," then responding that it was not possible that she had one conversation in March 2009 and one in March 2010 since she has "only ever spoke to one person [regarding Plaintiff]").)

[6] Plaintiff was self-employed from 1992 to 1994.  (Pl.'s Aff. ¶ 3.)  From 2000 to 2002, Plaintiff was engaged in taking care of family matters.  (Pl.'s Resume, Pl.'s Aff. Ex. A, ECF No. 16.)

8, 9.)  On October 12, 2011, Defendant filed an Answer with affirmative defenses.  (ECF No. 10.)  On January 27, 2012, Defendant filed the instant Motion for Summary Judgment with respect to the two remaining counts, defamation and tortious interference with a contract.  (Def.'s Mot., ECF No. 15.)  On February 13, 2012, the Court granted the parties' joint motion to extend pre-trial deadlines.  (ECF No. 18.)  On February 23, 2012, Plaintiff opposed Defendant's Motion for Summary Judgment.  (Pl.'s Opp.)

## II.   LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); s*ee also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita*, 475 U.S. at 587 (citations omitted).  When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  Courts must not resolve factual

disputes or make credibility determinations.  *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54

F.3d 1125, 1127 (3d Cir. 1995).

## III.   DISCUSSION

The parties agree that Pennsylvania law applies to the remaining claims of defamation

and tortious interference with a contract.  (*See* Def.'s Br. 6, 13-14, ECF No. 15-1; Pl.'s Opp. 10,

15.)[7]  We will apply Pennsylvania law to those claims.  *See, e.g., Marci's Fun Food, LLC v.*

*Shearer's Foods, Inc.*, No. 10-188, 2011 WL 5360808, at *5 n.5 (W.D. Pa. Nov. 7, 2011)

(applying Pennsylvania law to tortious interference claim because parties agreed that such law

applied).

### A.   Defamation

Plaintiff asserts that Holohan's statements that Plaintiff's strengths included "annoying

people," that Plaintiff had no problem solving skills and no technical skills, that Plaintiff had

conflicts with employees and customers, and that Defendant would not rehire Plaintiff constitute

defamation.  (Compl. ¶ 11; Pl.'s Opp. 11.)  Under Pennsylvania law, a plaintiff asserting

defamation must prove:

> (1) [t]he defamatory character of the communication[;] (2) [i]ts publication by the
> defendant[;] (3) [i]ts application to the plaintiff[;] (4) [t]he understanding by the
> recipient of its defamatory meaning[;] (5) [t]he understanding by the recipient of it
> as intended to be applied to the plaintiff[;] (6) [s]pecial harm resulting to the plaintiff
> from its publication[; and] (7) [a]buse of a conditionally privileged occasion.

42 Pa. Cons. Stat. Ann. § 8343(a).  The defendant has the burden of proving, when the issue is

---

[7] In his Opposition, Plaintiff characterizes the third count as "tortious interference with
economic opportunity."  (Pl.'s Opp. 1.)  However, he has characterized this count as tortious
interference with a contract in his other pleadings.  (*See, e.g.*, Compl. ¶¶ 30-34; Pl.'s Resp. Mot.
to Dismiss 3, ECF No. 6.)

properly raised, "(1) [t]he truth of the defamatory communication[;] (2) [t]he privileged character of the occasion on which it was published[; and] (3) [t]he character of the subject matter of defamatory comment as of public concern." *Id.* at § 8343(b).

A statement is considered slander per se when the "speaker imputes to another conduct, characteristics, or a condition that would adversely affect her in her lawful business or trade . . . ." *Walker v. Grand Cent. Sanitation, Inc.*, 634 A.2d 237, 241 (Pa. Super. Ct. 1993).  The statements that Plaintiff alleges constitute defamation fall into this category.  In a per se case, a plaintiff must prove general damages from a defamatory publication and cannot rely upon presumed damages.  *Id.* at 244.  In other words, he must prove actual harm to his reputation as a result of the publication.  *Id.*  Any damages sustained from an injury to reputation is "judged by the reaction of other persons in the community, and not by the party's self-estimation." *Rybas v. Wapner*, 457 A.2d 108, 110 (Pa. Super. Ct. 1983).

The evidence in the record does not support a claim for defamation.  In *Milione v. Hahnemann University*, No. 89-6761, 1992 WL 57670 (E.D. Pa. Mar. 18, 1992), the plaintiff sued her former employer, a hospital, for, among other things, defamation.  The plaintiff had been discharged by the hospital for violating its dress code.  *Id.* at *1.  After being terminated, the plaintiff attempted to secure other employment.  She had several positive interviews and at least one offer but, ultimately, was unsuccessful.  *Id.*  She attributed her difficulty in securing employment to her former employer.  She alleged that it had made "derogatory" and "defamatory" statements about her to prospective employers.  *Id.*  She used a friend to pose as a prospective employer.  *Id.* at *4.  The friend called the plaintiff's former supervisor as a reference and elicited a statement from the supervisor that the plaintiff was a bad employee.  *Id.*  The court

9

granted the defendant's summary judgment motion because it found that the evidence was "insufficient as a matter of law to permit a reasonable trier of fact to conclude that plaintiff was defamed." *Id.* The court held that the statement "was not capable of defamatory meaning" and that the plaintiff could not have suffered any harm as a result of the statement because the audience receiving the information was not a prospective employer. Indeed, the audience "was clearly a person who disbelieved the statement." *Id.*

The facts of *Milione* are strikingly similar to the facts here and compel the same result. Plaintiff has failed to demonstrate any publication of a statement that was understood by the recipient to have a defamatory meaning. The record clearly demonstrates that other than the March 2010 conversation between Holohan and the private investigator, neither Holohan nor anyone else working for Defendant ever discussed Plaintiff with anyone. No one working for Defendant ever received a request from a potential employer for references concerning Plaintiff. Plaintiff has offered no evidence to the contrary. Moreover, like the friend in *Milione*, the private investigator here was hired by Plaintiff and could not have been a person who believed the allegedly defamatory statement. Thus, Plaintiff cannot establish that a defamatory statement was published and understood as such. It logically follows that he cannot establish actual harm or damage.

Even if Plaintiff could establish that Defendant published a statement that was understood by the recipient to have defamatory meaning, he has no evidence of any harm or damage. Plaintiff has offered no evidence that the allegedly defamatory statements had an adverse effect on his job prospects. Of the over thirty potential employers to which Plaintiff submitted job applications, all either had no application on file from Plaintiff or simply chose not to pursue

hiring Plaintiff.  (Subpoena Resp.)  None of these employers contacted Holohan or anyone else at Defendant to obtain a job reference concerning, or to otherwise talk about, Plaintiff.  Plaintiff has provided no evidence to the contrary.  Plaintiff has submitted no deposition testimony and has provided no affidavits from any potential employer in support of his claim.  It has been over four years since Plaintiff's termination from Defendant's employment.  He has had more than ample time to do so.  *See Pyle v. Meritor Sav. Bank*, Nos. 92-7361, 92-7362, 1996 WL 115048, at *4 & n.11 (E.D. Pa. Mar. 13, 1996) (finding no evidence of harm as a result of allegedly defamatory statements where plaintiff failed to take a deposition or provide an affidavit from any prospective employer to help substantiate his claim and where the action was initiated more than seven years ago in state court and was pending before the federal court for approximately four years).  Plaintiff admitted that he does not know whether any of the employers to which he submitted a job application contacted anyone at Defendant.  He makes only conclusory allegations.  Plaintiff has failed to establish the existence of genuine issues of material fact.  *See, e.g.*, *id.* at *4 (granting summary judgment where the plaintiff failed to go beyond "mere allegations in his Complaint").

Plaintiff contends that he has applied for jobs at "over 400 local companies" and "has not received even one job offer despite his lifetime of employment in retail sales."  (Pl.'s Opp. 14; *see also* Job Search List.)  He claims that the fact that Holohan provided negative information about him over the telephone to an "unknown party" is "circumstantial evidence that it had happened before."  (*Id.*)  We disagree.  A nonmoving party must set forth "specific facts" to support his Complaint and cannot rely on conclusory allegations at the summary judgment stage.  *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990).  Here, Plaintiff has not brought forth any

11

circumstantial evidence that Holohan provided information about Plaintiff to anyone other than the private investigator.  Moreover, the case on which Plaintiff relies is easily distinguished.  In *Porter v. Joy Realty, Inc.*, 872 A.2d 846 (Pa. Super. Ct. 2005), the court did conclude that circumstantial evidence may be sufficient to prove "publication" for a defamation claim.  *Id.* at 847.  However, the quantity and quality of the circumstantial evidence presented in the instant case is not nearly sufficient to allow Plaintiff's defamation claim to survive a motion for summary judgment.  In *Porter*, the court noted that there had been a "*sudden dramatic, unprecedented and otherwise inexplicable cessation* of all of the referrals which [the plaintiff] *had been receiving regularly*" prior to the event that caused the alleged defamer to make negative statements.  *Id.* at 849 (emphasis added).  Here, Plaintiff has produced no evidence of a dramatic, unprecedented and otherwise inexplicable cessation of potential employers seeking to interview or hire him.  Plaintiff was terminated in August 2007.  Holohan spoke with the private investigator in March 2010.  There is absolutely no evidence that Plaintiff had been receiving regular job offers either prior to the March 2010 conversation or after the March 2010 conversation.  There is simply no evidence that there was a sudden, dramatic, unexpected and inexplicable cessation of job offers.  Moreover, there is no evidence that any of the hundreds of prospective employers to whom Plaintiff allegedly sent employment applications ever talked to Holohan or anyone else associated with Defendant.  Plaintiff is asking us to speculate.  This we are not permitted to do.  We are satisfied that Defendant is entitled to summary judgment on Plaintiff's defamation claim.

### B.     Tortious Interference With a Contract

Plaintiff asserts that Defendant tortiously interfered with Plaintiff's prospective

relationship with numerous employers by "defaming him."  (Compl. ¶ 31; *see also* Pl.'s Opp. 1 (alleging that as a result of Holohan's negative references and defamation, Plaintiff could not gain employment from 2007 to present).)

Pennsylvania recognizes both interference with existing contractual relations and interference with prospective contractual relations as branches of the tort of interference with contract.  *See U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 925 (3d Cir. 1990).  "While the two branches of tortious interference are distinct, they share essentially the same elements." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 529 (3d Cir. 1998).   A claim for intentional interference with contractual or prospective contractual relations requires proof of:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

*Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009); *Brokerage Concepts*, 140 F.3d at 530 (citing *Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1988)); *see also Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa. 1979); *Birl v. Phila. Elec. Co.*, 167 A.2d 472, 474 (Pa. 1960).

The Pennsylvania Supreme Court has defined a "prospective contractual relation" as a "'reasonable likelihood or probability.  This must be something more than a mere hope or the innate optimism of a salesman . . . . This is an objective standard which of course must be supplied by adequate proof.'"  *Polay v. West Co.*, No. 88-9877, 1990 WL 59351, at *10 (E.D. Pa.

13

May 7, 1990) (citing *Thompson Coal Co.*, 412 A.2d at 471 n.7 (citation omitted)); *see also*

*InfoSAGE, Inc. v. Mellon Ventures, L.P.*, 896 A.2d 616, 627-28 (Pa. Super. Ct. 2006) (same)

(citing *Glenn v. Point Park Coll.*, 272 A.2d 895, 898-99 (Pa. 1971)).

Plaintiff cannot identify a single job he would have obtained with any reasonable

likelihood or probability.  Defendant has submitted over thirty subpoena responses from potential

employers that have been identified by Plaintiff and, subsequently, subpoenaed by Defendant.

(*See* Subpoena Resp.)  These responses show that the potential employers have no application by

Plaintiff on file or that the potential employers simply chose not to pursue hiring Plaintiff.  (*See*

*id.*)  Plaintiff has submitted no evidence to the contrary.  *See InfoSAGE*, 896 A.2d at 628

(affirming grant of summary judgment on tortious interference with contract claim where

plaintiff was "unable to present evidence sufficient to challenge the broad array of evidence

which defendants adduced in support of" their summary judgment motion).  Moreover, he has

submitted no evidence demonstrating that he would have obtained a job with any one of those

employers with reasonable likelihood or probability.  *See Powell v. First Rep. Bank*, 274 F. Supp.

2d 660, 673 (E.D. Pa. 2003) (granting summary judgment with respect to interference with

prospective economic advantage claim because "[a]side from the plaintiff[']s bare allegations,

there is no evidence to suggest that the . . . transaction would have occurred but for the

defendants' action"); *Polay*, 1990 WL 59351, at *11 (granting summary judgment on tortious

interference with prospective contractual relations claim where plaintiff admitted that she was

"unable to identify a single job she would have gotten with any 'reasonable likelihood or

probability'") (citation omitted).  At most, Plaintiff claims that "[f]rom his experience in a

lifetime of retail sales, [he] knew there were jobs out there for which [he] was eminently

qualified and should be receiving." (Pl.'s Aff. ¶ 16.) Such a conclusory assertion is plainly insufficient. *See GNC Franchising LLC v. Khan*, Nos. 05-1341, 06-283, 2008 WL 612749, at *12 (W.D. Pa. Mar. 3, 2008) (granting summary judgment on tortious interference with prospective contractual relation claim where the only evidence offered in support of plaintiff's claim was "his own self-serving deposition testimony . . . , none of which however establish a 'reasonable likelihood or probability' of a prospective business relationship with any third party").

Accordingly, we will grant Defendant's Motion with respect to Plaintiff's claim for tortious interference with a contract.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's Motion will be granted.

An appropriate Order follows.

**BY THE COURT:**

*/s/ R. Barclay Surrick*
**U.S. District Judge**